UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ENRIC MALLORQUI-RUSCALLEDA, Plaintiff, | ) | |
| v. | ) | No. 1:24-cv-00519-SEB-MG |
| THE TRUSTEES OF INDIANA UNIVERSITY - PURDUE UNIVERSITY INDIANAPOLIS, Defendant. | ) | |

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff Enric Mallorqui-Ruscalleda ("Mr. Mallorqui-Ruscalleda" or "Plaintiff"), who is proceeding *pro se*, brought this lawsuit against his former employer, Defendant Trustees of Indiana University – Purdue University, Indianapolis ("IU" or "IUPUI"), alleging that IU discriminated against him on the basis of his race and/or national origin, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* Now before the Court is Defendant's Motion for Summary Judgment. Dkt. 59. For the reasons stated below, that motion is **GRANTED**.

**LEGAL STANDARD**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Because summary judgment requires "no *genuine* issue of *material* fact," "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247−48 (1986) (emphasis in original). Material facts are those that "might affect the outcome of the suit," and a dispute of material fact is genuine when "a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248.

As the "put up or shut up" moment in a lawsuit, summary judgment requires parties to "show what evidence [they] ha[ve] that would convince the trier of fact" to find in their favor on any disputed elements. *Olendzki v. Rossi*, 765 F.3d 742, 749 (7th Cir. 2014). A movant's "facts as claimed and supported by admissible evidence . . . are admitted without controversy" unless "the non-movant specifically controverts the facts . . . with admissible evidence." S.D. Ind. L.R. 56-1(f). Because summary judgment is not "a vehicle for resolving factual disputes," the district court need not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). "The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* (citing *Anderson,* 477 U.S. at 249–50).

## BACKGROUND

### I. Litigation History

Below is a brief summary of the contracted procedural history that has preceded our resolution of IU's Motion for Summary Judgment:

On March 20, 2024, Mr. Mallorqui-Ruscalleda, who is Hispanic and a Spanish national, filed this lawsuit against IU, claiming that he was discriminated against on the basis of race and/or national origin, in violation of Title VII. In September 2024, Mr. Mallorqui-Ruscalleda's attorneys withdrew their appearances, dkt. 25, 31, after which point Mr. Mallorqui-Ruscalleda proceeded to actively (and vigorously) litigate this lawsuit.

On March 20, 2025, IU moved for summary judgment. Dkt. 59. On May 22, 2025, the Magistrate Judge ordered IU to reproduce the entirety of its nearly 8,500-page discovery production to Mr. Mallorqui-Ruscalleda. Dkt. 104. (Although IU had previously transmitted these materials to Plaintiff's former counsel, Mr. Mallorqui-Ruscalleda maintained that he himself had no

such access to the files, thereby hindering his ability to prepare a response in opposition to IU's motion for summary judgment.) Over the course of the ensuing months, both the Court and IU patiently accommodated Mr. Mallorqui-Ruscalleda's self-represented status and his repeated assertions concerning his inability to access and review discovery materials, notwithstanding his (still) unsubstantiated allegations to the contrary. *See* dkt. 159.

On May 28, 2026, after resolving dozens of Mr. Mallorqui-Ruscalleda's spurious motions, meritless objections, and frivolous submissions, *see generally* dkt. 84, 115, 148, 159, we directed Mr. Mallorqui-Ruscalleda to submit a summary judgment response brief no later than June 25, 2026. Dkt. 159 at 5. We also instructed "that his brief w[ould] be regarded as the sole, operative response, thus superseding any of his prior submissions" and that"[a]ny failure by Plaintiff to fully comply with these instructions could result in a summary ruling on Defendant's Motion for Summary Judgment." *Id.*

Within three days, on June 1, 2026, Mr. Mallorqui-Ruscalleda moved for an extension of time, which the following day we denied. Dkt. 162. We did, however, grant his separate request for a PACER fee exemption in order to facilitate his remote access to the electronic case files maintained by this Court for this case only. *Id.* at 3. We also clarified that "Plaintiff shall not be exempt from the payment of fees incurred in connection with other uses of the PACER system in this Court, nor shall this Order affect any preexisting balance that Plaintiff owes." *Id.* On June 24, 2026, we granted Mr. Mallorqui-Ruscalleda's request for a fourteen-day extension of time in light of a discrepancy in his address that had affected service. Dkt. 165. Mr. Mallorqui-Ruscalleda's deadline to file a summary judgment response was July 9, 2026. Mr. Mallorqui-Ruscalleda was also forewarned that "[a]ny further efforts . . . to obtain additional extensions of time will likely be summarily denied, given the chronology of events" in this litigation. *Id.*

On July 8, 2026, Mr. Mallorqui-Ruscalleda filed a so-called "Supplemental Emergency Notice and Protective Rule 56(d) Submission," dkt. 169, reiterating his alleged "lack[ ] [of] meaningful access to the complete docket and case record," which arguments we have repeatedly rejected as unavailing. Dkt. 167. Shortly thereafter, on July 17, 2026, Mr. Mallorqui-Ruscalleda did however file a Motion to Confirm Case Status, Supplement the Procedural Record, and for Narrowly Tailored Alternative Relief. Dkt. 170. These motions remain pending.

Meanwhile, the July 9, 2026, deadline passed, and Mr. Mallorqui-Ruscalleda did not file a summary judgment response brief in accordance with our explicit instructions.[1] IU's Motion for Summary Judgment is therefore ripe for ruling, albeit without the benefit of a timely response in opposition from Mr. Mallorqui-Ruscalleda. Dkt. 59.

## II. Factual Background

In August 2018, Mr. Mallorqui-Ruscalleda commenced his employment at IU, joining the faculty as an Assistant Professor and Spanish Language Program Coordinator. Mallorqui-Ruscalleda Dep. 34:9–21, dkt. 59-1.

According to IU's Faculty Policy, which applied to Mr. Mallorqui-Ruscalleda's employment,

[1] We recognize that, two months *after* the relevant deadline elapsed, Plaintiff purported to file a summary judgment response brief. As reflected in the procedural history of this litigation, Plaintiff has been afforded considerable flexibility with regard to his summary judgment materials. Although we are sympathetic to his challenges as a self-represented litigant, the Court's orders and the deadlines they impose are straightforward and important. Notwithstanding Plaintiff's personal circumstances, it is well-established that "pro se litigants are not entitled to a general dispensation from the rules of procedure or court imposed deadlines." *Jones v. Phipps*, 39 F.3d 158, 163 (7th Cir. 1994). Given that IU's summary judgment motion has remained pending for well over a year, Plaintiff's inability (or unwillingness) to comply with court deadlines does not support consideration of his belated submission. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 607–08 (7th Cir. 2006) (affirming summary judgment where district court enforced deadline and declined to consider non-movant's untimely response brief).

> Full time faculty members and other academic appointees typically have responsibility for research, teaching and service. Much of this work necessarily involves being physically present on campus—in the lab, the classroom or the office. Service to the department, school and campus and mentoring of colleagues and students is dependent upon an active, engaged and present faculty. Moreover, the presence of the faculty is critical for the health and wellbeing of the campus community.
>
> Exceptions to the general expectation of working and living within proximity of one's campus will be rare, truly exceptional, and entirely at the discretion of the dean.

Dkt. 59-4 at 76; Miller Decl. ¶ 4, dkt. 59-3.

At the onset of the COVID-19 pandemic in 2020, IU permitted faculty members to work remotely "in an effort to enhance the safety of both faculty and students." Eitle Decl. ¶ 3, dkt. 59-7. IU required certain faculty members—namely, those performing remote work from out of state or from an international location—to sign a Memorandum of Understanding ("MOU") outlining the conditions of their remote employment. *Id.*

Mr. Mallorqui-Ruscalleda was one such faculty member who opted to work remotely from California, where he resided with his family. Mallorqui-Ruscalleda Dep. 60:15–25, dkt. 59-1. In accordance with IU's policies, Mr. Mallorqui-Ruscalleda signed an MOU allowing him to work remotely for one year. *Id.*

In June 2021, IU enacted the Remote Work for Academic Appointees policy (hereinafter, "ACA-83"), which provides, in relevant part, that IU is an "in-person institution" and that "[s]ubstantial remote work by full-time academic appointees is only rarely permitted, and must be expressly approved by the Chancellor or Provost, or if delegated, dean or program director." McGuire Decl. ¶¶ 4–5, dkt. 59-5; dkt. 59-6 at 4. Continuing, the ACA-83 states that "[a]ssignment of an academic appointee to a remote work arrangement does not set a precedent that the appointee will always be remote." McGuire Decl. ¶ 6, dkt. 59-5; dkt. 59-6 at 6.

In advance of the fall 2021 semester, Mr. Mallorqui-Ruscalleda returned to campus, as IU instructed. Mallorqui-Ruscalleda Dep. 61:10–19, dkt. 59-1. On August 24, 2021, Dean Tamela Eitle of the IU School of Liberal Arts ("Dean Eitle") circulated a school-wide welcome email to all faculty, including Mr. Mallorqui-Ruscalleda, which reiterated IU's expectations regarding faculty members' in-person attendance. *See* dkt. 59-8. Specifically, Dean Eitle stated, in relevant part:

> This year, more than ever, we need to be present on campus so that current and prospective students do not face closed doors down our hallways. Our staff will be working on campus at least three days a week, and some have chosen to return to campus five days a week. Faculty not on sabbatical or other leave should do their part to create a welcoming, vibrant, and collegial school by spending at least two days a week on campus, whether their classes are online, virtual, or in person.

*Id.* at 1.

In February 2023, in the midst of the spring semester, Mr. Mallorqui-Ruscalleda requested (and IU granted) a leave of absence. Upton Decl. ¶ 3, dkt. 59-11. In a February 23, 2023, email to Mr. Mallorqui-Ruscalleda, Associate Dean for Faculty Affairs Thomas Upton ("Dean Upton") clarified that Mr. Mallorqui-Ruscalleda was "expected to be back in Indiana in May once [his] FMLA-Family Support leave end[ed]." Dkt. 59-12 at 1. Noting that Mr. Mallorqui-Ruscalleda "ha[d] not been continuously residing in Indiana th[at] past year as required by School and IUPUI policy," Dean Upton relayed that Mr. Mallorqui-Ruscalleda would be "required to teach at least one course per semester in person on campus." *Id.* Mr. Mallorqui-Ruscalleda was also advised that his failure to return to campus by May 10, 2023, would result in his placement on an unpaid leave of absence. *Id.* at 3.

Following the expiration of his approved leave, Mr. Mallorqui-Ruscalleda did not return to Indianapolis. Eitle Decl. ¶ 7, dkt. 59-7. On August 16, 2023, Mr. Mallorqui-Ruscalleda contacted Associate Professor Rosa Tezanos-Pinto ("Professor Tezanos-Pinto"), who serves as the Chair of the Department of World Languages and Cultures, stating, "I am not able to go back to

Indianapolis, and therefore, I will not be there to start classes. I can teach online but not on campus and cannot move back to Indianapolis." Dkt. 59-14 at 2.

Approximately five days later, on August 21, 2023, Dean Eitle emailed Mr. Malloqui-Ruscalleda a notice of his separation from IU. Harkening back to Mr. Mallorqui-Ruscalleda's February 2023 email correspondence with Dean Upton, Dean Eitle reiterated that Ms. Mallorqui-Ruscalleda's "employment [wa]s dependent on [his] being in Indiana to contribute to the IUPUI community through teaching, service, and research." *Id.* at 1. In a formal termination letter (attached to the August 21st email), Dean Eitle explained:

> You have not been granted permission by the School of Liberal Arts to work remotely nor do you have a campus approved accommodation to work remotely because you failed to provide adequate medical documentation to support your need for an accommodation.
>
> As you have clearly stated that you will not be at IUPUI to teach your in-person classes on the first day of class, your employment with the School of Liberal Arts at IUPUI has been terminated as of August 21, 2023.

Dkt. 59-10.

In this lawsuit, Mr. Mallorqui-Ruscalleda alleges that his termination constituted unlawful discrimination on the basis of his race and/or national origin, in violation of Title VII.

**DISCUSSION**

"A plaintiff asserting a Title VII claim for race [or national origin] discrimination must present enough evidence to 'permit a reasonable factfinder to conclude that [his] race [or national origin] caused the adverse employment action.' " *Bragg v. Munster Med. Rsch. Found. Inc.*, 58 F.4th 265, 271 (7th Cir. 2023) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)) (citation modified). "The plaintiff may accomplish that task in several ways, including by use of the indirect method offered by the *McDonnell Douglas* burden-shifting framework." *Id.* That avenue requires the plaintiff to establish (1) that he is a member of a protected class; (2) that

he performed his job to his employer's expectations; (3) that he suffered an adverse employment action; and (4) that one or more similarly situated individuals outside his protected class received better treatment. *Anderson v. Street*, 104 F.4th 646, 652 (7th Cir. 2024).

"Once the plaintiff makes this initial showing, the burden shifts to the employer to 'articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual.' " *Bragg*, 58 F.4th at 271 (citation omitted). "Regardless of the framework, we ultimately consider all admissible evidence as a whole 'and determine whether a reasonable jury could find that the plaintiff suffered an adverse action because of his protected characteristics.' " *Anderson*. 104 F.th at 652–53 (quoting *Singmuongthong v. Bowen*, 77 F.4th 503, 508 (7th Cir. 2023)).

In moving for summary judgment, IU does not dispute that Mr. Mallorqui-Ruscalleda is a member of a protected class by virtue of his race (Hispanic) and/or national origin (Spain), nor does IU dispute that Mr. Mallorqui-Ruscalleda's termination qualifies as an adverse employment action. Dkt. 60 at 4. Rather, IU contends that Mr. Mallorqui-Ruscalleda's claim necessarily fails as a matter of law because he cannot adduce evidence that he met IU's legitimate employment expectations and/or that he was treated less favorably than other similarly situated faculty members outside of his protected class(es).

Where, as here, the employer "raise[s] the employee's performance as the reason for the adverse employment decision, the court 'may skip the analysis of the *prima facie* case and proceed directly to the evaluation of pretext.' " *Bragg*, 58 F.4th at 271 (quoting *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477–78 (7th Cir. 2010)). Accordingly, "we need not consider [Mr. Mallorqui-Ruscalleda's] prima facie case under *McDonnell Douglas* or conduct a separate analysis of the facts under the two frameworks." *Vichio v. US Foods, Inc.*, 88 F.4th 687, 691 (7th Cir. 2023).

Rather, we will proceed directly to a consideration of whether the record evidence supports the conclusion that IU's stated reason for his termination was pretext for race and/or national origin discrimination.

"Pretext is a lie, specifically a phony reason for some action, not just faulty reasoning or mistaken judgment on the part of the employer." *Bragg*, 58 F.4th at 271 (cleaned up). "The plaintiff must demonstrate pretext by a preponderance of the evidence." *Brooks v. Avancez*, 39 F.4th 424, 435 (7th Cir. 2022). "To meet this burden, [the plaintiff] 'must show that either (1) it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or (2) that an employer's explanation is not credible.' " *Bless v. Cook Cnty. Sheriff's Off.*, 9 F.4th 565, 573 (7th Cir. 2021) (quoting *Hudson v. Chicago Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004)). In evaluating an employer's stated reasons for termination, the pretext inquiry concerns only "the honesty of the employer's explanation, rather than its validity or reasonableness." *Crain v. McDonough*, 63 F.4th 585, 593 (7th Cir. 2023).

In this case, IU describes its nonpretextual reason for Mr. Mallorqui-Ruscalleda's termination as his failure to return to Indianapolis to teach classes both in person and on campus, meaning that Mr. Mallorqui-Ruscalleda failed to meet his employer's legitimate expectations. The record evidence adduced by IU demonstrates that in-person instruction was regarded as an essential aspect of Mr. Mallorqui-Ruscalleda's employment as a Spanish professor. Indeed, IU's Faculty Policy outlined the university's expectations, stating that "[m]uch of th[e] work" undertaken by fulltime faculty members "necessarily involves being physically present on campus" because "[s]ervice to the department, school and campus and mentoring of colleagues and students is dependent upon an active, engaged and present faculty" and because "the presence of the faculty is critical for the health and wellbeing of the campus community." Dkt. 59-4 at 76.

That many employees, Mr. Mallorqui-Ruscalleda included, "were able to work remotely temporarily when forced to do so by a global health crisis does not mean that those jobs do not have essential functions that require in-person work over the medium to long term." *Kinney v. St. Mary's Health, Inc.*, 76 F.4th 635, 644 (7th Cir. 2023) (affirming summary judgment on ADA claim where in-person attendance was an essential function of the position). To the contrary, the ACA-83 policy, which IU enacted in June 2021, reflects the university's commitment to its "fundamental character as an in-person institution and an engaged academic community for teaching, learning, service, research, creative activity, and librarianship anchored by full-time faculty members and librarians who are physically present on campus regularly." Dkt. 59-6 at 4. The February 2023 email correspondence regarding Mr. Mallorqui-Ruscalleda's leave of absence likewise shows that IU's in-person expectations were fully communicated with Mr. Mallorqui-Ruscalleda. Based on the foregoing, we conclude that IU clearly maintained a legitimate expectation that its faculty members be physically present on campus in order to fulfill their job responsibilities.

The record evidence shows that, at the time of his termination, Mr. Mallorqui-Ruscalleda was not meeting IU's legitimate employment expectations of being physically present on campus. Mr. Mallorqui-Ruscalleda's August 16, 2023, email communication to Professor Tezanos-Pinto reveals that he was "not able to go back to Indianapolis" and would "not be there to start classes." Dkt. 59-14 at 2. In other words, days before fall semester commenced, Mr. Mallorqui-Ruscalleda informed his employer that he would not be returning to campus to teach his classes, several of which were scheduled for in-person instruction. As reflected in the formal notice of termination, Dean Eitle expressly relied upon Mr. Mallorqui-Ruscalleda's stated inability to return to campus as the basis for his termination. Dkt. 59-10. Based on this evidence, no reasonable jury could conclude that Mr. Mallorqui-Ruscalleda's race and/or national origin caused his termination.

Mr. Mallorqui-Ruscalleda has attempted to buttress his discrimination theory by alleging that similarly situated comparators were treated more favorably than he. " '[C]omparator evidence and selective enforcement of an employer's rules' are relevant to a pretext analysis." *Napier v. Orchard Sch. Found.*, 137 F.4th 884, 894 (7th Cir. 2025) (quoting *Khowaja v. Sessions*, 893 F.3d 1010, 1015 (7th Cir. 2018)). "The similarly-situated [inquiry] calls for a 'flexible, common-sense' examination of all relevant factors" in order to gauge whether there are "sufficient commonalities on the key variables between the plaintiff and the would-be comparator" such that a jury could reasonably infer discrimination. *Coleman v. Donahoe*, 667 F.3d 835, 846, 841 (7th Cir. 2012) (quoting *Henry v. Jones*, 507 F.3d 558, 564 (7th Cir. 2007)). The purpose behind "the comparison analysis is to eliminate other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Formella v. Brennan*, 817 F.3d 503, 512 (7th Cir. 2016) (cleaned up). "Similarly situated employees must be directly comparable to the plaintiff in all material respects." *Napier*, 137 F.4th at 894 (internal quotation and citation omitted). "In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Coleman*, 667 F.3d at 847 (internal quotation and citation omitted).

In this case, Mr. Mallorqui-Ruscalleda has failed to adduce evidence of a similarly situated full-time faculty member who declined to return to Indianapolis in order to fulfill in-person job responsibilities while nonetheless retaining their employment with IU. Although Mr. Mallorqui-Ruscalleda did identify during his deposition several ostensible comparators who were allegedly permitted to telework, Mallorqui-Ruscalleda Dep. 48:18–54:18, dkt. 59-1, he has not mustered any

concrete evidence from which a reasonable jury could find that his former colleagues were "directly comparable" to him in "all material respects." *Napier*, 137 F.4th at 894. For example, Mr. Mallorqui-Ruscalleda has adduced no evidence that his purported comparators were fulltime, tenure-track professors and/or that they failed to heed IU's explicit instructions to return to campus for work and kept their positions. Mr. Mallorqui-Ruscalleda's bare speculations to the contrary do not suffice to create a genuine dispute of fact. *Anderson*, 104 F.4th at 651.

Mr. Mallorqui-Ruscalleda's best evidence of a similarly situated comparator is Dr. Thorsten Carstensen ("Dr. Carstensen"), a Caucasian German-language professor who resigned from his associate professorship in December 2022 after IU denied his request to work remotely. Eitle Decl. ¶ 6, dkt. 59-7. (Dr. Carstensen has evidently maintained ties with IU through an unpaid, non-faculty appointment as an international scholar, however. Dkt. 59-9.) Dr. Carstensen's resignation does not advance Mr. Mallorqui-Ruscalleda's case. To the contrary, the circumstances of Dr. Carstensen's resignation—to wit, that he could no longer fulfill IU's legitimate expectations of working in-person—demonstrate that IU enforced its policy uniformly.

Evaluating the record evidence "as a whole," we conclude Mr. Mallorqui-Ruscalleda has introduced no evidence whatsoever that would permit a reasonable factfinder to conclude that his race and/or national origin caused the discharge of which he complains. *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021). Because Mr. Mallorqui-Ruscalleda has failed to present "enough evidence to allow the jury to find in his favor," *id.* at 957–58 (citation modified), IU's motion for summary judgment must and therefore shall be **granted** in its entirety. Dkt. 59.

## CONCLUSION

For the foregoing reasons, IU's Motion for Summary Judgment is hereby **GRANTED**. Dkt. 59. All other motions are hereby **DENIED as moot**. Dkt. 169, 170.

Final judgment shall issue accordingly.

IT IS SO ORDERED.

Date: 9/30/2026

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

ENRIC MALLORQUI-RUSCALLEDA
C/Ample, 15
17244 Cassa' de la

Emily M Stultz
emstultz@iu.edu